[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
I. Procedural:
This case comes before the court for dispositional proceedings on behalf of the minor child, Shyina B. The Department of Children and Families, her current custodian, believes it is in Shyina's best interest to remain with her foster family and be adopted by them (although no termination proceedings have been initiated at this time). Her maternal uncle, Andre Walker, and his wife, Lisa Walker, are seeking custody and guardianship of Shyina and were granted intervenor status for purposes of disposition in this matter. This court must consider the evidence presented and determine what the fair preponderance of the evidence proves to be in Shyina's best interest. Shyina was born on June 2, 1997 at Liberty and Memorial Hospital to Kenya B. who was at the time awaiting trial for the murder of Shyina's half-sibling, Mahkeva B, Kenya B. was convicted of Manslaughter in the First Degree and sentenced to twenty years in prison on August 20, 1998. Kenya B. has appealed her conviction. Respondent mother has consistently denied her guilt in the death of her daughter. Shyina was subject to a 96 hour hold and an order of temporary custody was put into effect June 5, 1997. On June 19, 1997, when Kenya's brother and sister-in-law, Andre and Lisa Walker, learned of Shyina's premature birth, they contacted DCF and on June 25, 1997 they filed a Motion to Intervene. Their motion was granted six months later on January 6, 1998.
At an adjudication hearing on August 18, 1998, Shyina was adjudicated Uncared For as she was homeless. The case continued to September 16, 1998 for disposition trial to begin. Respondent father's interests were defaulted as he failed to appear in this proceeding. CT Page 7789
The minor child, Shyina B, is currently placed with a foster family, the Fields, in New Milford, CT. According to Mrs. Field's testimony, the Fields have five other children in their home not including Shyina, plus Mr. Field's two children from a previous marriage who come on weekends. Both foster parents have been married before and have children by previous marriages. They bear no biological relationship to Kenya B. or her daughter, Shyina B.
Andre and Lisa Walker are the brother and sister-in-law of Kenya B. and are therefore Shyina's aunt and uncle. They have testified to their wish to assume custody of her. They came forward immediately upon learning of Shyina's premature birth and have persisted steadfastly through two years of hearings, evaluations and trials. At the January 6, 1998 hearing the parties agreed that the Walker's Motion to Intervene could be granted for dispositional purposes. On February 10, 1998, the parties met prior to trial, and Kenya B indicated that she would like her sister-in-law and brother considered by the court as a placement resource. At that point the Department requested, and it was agreed, that a court ordered psychological evaluation of the Walkers be performed by Dr. Mantell.
Dr. Mantell concluded in his report of March 12, 1998 that "The direct clinical examination . . . found no psychological characteristics that inherently preclude their active care of his sister's child . . . their circumstances and presentation would not recommend them for foster parent status on account of their youthfulness, dependency and the unsettled features of their financial situation."
On September 8, 1998 a Pre-Trial was held and trial dates for disposition were set for September 16, and 17, 1998. In the midst of evidentiary proceedings the parties reached a stipulated agreement on November 18, 1998 to have a further evaluation of Shyina interacting with the Walkers and the Fields and for the parties and the court to lend great weight to Dr. Rosado' s opinion in an attempt to reach a settlement consistent with Shyina' s best interest.
On January 19, 1999, an In Court Review was held at which time Dr. Rosado's written report was reviewed by the parties.
The actual trial commenced on September 16, 1998 and was held on various dates to a conclusion on April 28, 1999, with a total of seven days of testimony. CT Page 7790
II. Facts:
There are essentially two options available to this court: to grant custody and guardianship of Shyina to the maternal uncle and his wife or to commit the child to DCF for continued placement with the foster family.
It should be made clear at the onset that there has been no evidence presented that would detract from the setting of the foster family as a placement for Shyina. As a foster family, the Fields have provided a safe and nurturing environment for this child from the time of her birth. The Field family is commended for providing love and commitment to Shyina. That has undoubtedly contributed greatly to her appropriate developments. If this were the only option available to Shyina, it would be a wonderful selection. That, however, is not the case as the maternal uncle and his wife have also presented themselves as a resource for Shyina.
It should also be made clear that Andre and Lisa Walker love Shyina and expressed an interest in becoming a placement resource for her immediately after they learned of her birth. In that regard, they contacted DCF and attempted to secure placement with them. At that time they were told that placement with them would be -a problem as Lisa Walker had a "record" with them. They requested a copy of that "record" but were told that it was unavailable at that time. They were further told that although DCF would not, in fact could not, place Shyina with them as a result of this "record", they could hire an attorney and make a Motion to Intervene in the court action. (The facts and circumstances surrounding this "record" deserve additional attention and will be discussed later in this decision.)
Andre and Lisa Walker promptly hired a private attorney and, as stated, filed a Motion to Intervene on June 25, 1997 (granted by agreement for dispositional purposes on January 6, 1998). From the time of Shyina's birth they have remained steadfast in their commitment to offer themselves as a resource for Shyina. They appeared at every court hearing, together with their attorney and made it consistently clear to the court that they wanted their niece to live with them. Recognizing the fact that every time they appeared in court it most probably resulted in a loss of income and also the fact that they continued to incur the cost and expense of their counsel was further reflective of their CT Page 7791 commitment to their position.
Evidence presented allows the court to find that the Walker home also provides a safe, nurturing, and appropriate environment for Shyina. Not only does the court rely on the testimony of the expert witness, Dr. Rosado, in this regard but also on the fact that they have raised the daughter to Lisa Walker and, by all uncontroverted evidence, she is a bright, well adjusted child.
DCF has attempted to show that the safety of Shyina may well be at risk if respondent mother's conviction is overturned and Shyina is in the care and custody of the Walkers. This position stems from the fact that the Walkers have consistently held the belief that she is innocent of the charges against her. As a result of her conviction and sentence, by the time of mother's release in the ordinary course of events, Shyina will be of sufficient age to not make that fear a realistic one. If her conviction is overturned, however, then her conviction was in error and perhaps the belief of the Walkers in her innocence was not misplaced. In either case, it can reasonably be assumed that Shyina will be safe from harm. In any event, does not the State Department of Children and Families continue to have the duty to protect the children of this State, including Shyina? Should it therefore not monitor the legal status of respondent mother whatever the disposition of this case? If DCF has concerns over the safety of Shyina, it has the power and authority to protect her at any time in the future. The court does not find the State's argument persuasive in this regard.
The State has presented testimony and has argued that respondent mother was at one or more points in time in favor of having Shyina remain with the foster family. There is no clear indication of whether this is entirely true in all regards. There is some indication that DCF facilitated a visit of the foster mother with respondent mother which would have presented respondent mother with a person who was apparently an effective and appropriate caretaker for her daughter. The circumstances of this visit are somewhat suspect. Respondent mother had filed for an administrative hearing to see if Shyina could be placed with the Walkers (5/98). The hearing did not take place, however, the foster mother was brought by DCF to the hearing location to meet with respondent mother to discuss an open adoption agreement. No agreement was reached. It is clear that DCF had by then taken the position that they would not, indeed "could not" approve the Walkers as a placement resource. As a result, it is not clear to CT Page 7792 the court that respondent mother saw herself able to make a choice or express a preference at that time. What is clear is that respondent mother did express to the court, through her attorney's representations, at a court hearing on January 6, 1999, that she would like her brother to be considered as a placement resource. She also expressed frustration and disappointment that her daughter was being denied access to her biological family.[1] Respondent Mother further leaves no doubt in her Post Trial Memorandum that she wishes her daughter Shyina to be placed with her biological family, namely her Uncle, Andre Walker.
DCF apparently holds the following facts as significant: that Andre Walker is 22 years old, holds a GED, does not attend church, has adopted no formal religion and has a varied employment history. Testimony was also elicited from Mr. Walker as to his very close relationship with his sister, respondent mother, and his love and concern for her. Further testimony revealed the somewhat dysfunctional family life he grew up in and the care his sister gave to him, i.e.: cooking for him, feeding him, making sure he had a bath and making sure he was dressed for bed, when his mother got drunk.
Although the apparent intent of the Department was to picture Mr. Walker in a poor light by questioning him in these regards, it became clear to the court that he in fact overcame a difficult childhood to achieve what he had in life; a high school diploma and a stable family life, all with the help of his sister, respondent mother.
This testimony also provided a clear and rational basis for his love for his sister and accounts for his positions and feelings for and about her, as reflected in his testimony.
Although his work history is not stable in the sense that he has not held one job for a long period of time, there is job stability in the sense that there is nothing in the testimony to the effect that he has remained unemployed for any significant length of time.
There are realities of life that we must all recognize and one of them is that we do not change the realities of life when we walk into a courtroom. Mr. Walker has a high school diploma and no apparent job skills. The kinds of employment offered and available to him are not more than relatively minimal, low paying CT Page 7793 jobs. Once again, what is impressive to the court is that he has continued to maintain employment, albeit at different jobs, on a consistent basis.
Much was said, not only during the trial but at various hearings before the court prior thereto, regarding the "record" of Lisa Walker. The allegations contained therein were vague and indefinite, at best, and were irrelevant to the main issue of this case. The "record" is relevant, however, to account for the reasons why Andre and Lisa Walker were not initially considered by DCF to be a placement resource. As stated, when Lisa Walker was first informed of this "record", she requested a copy of same. She was told it was not available yet was told that this "record" would preclude here from becoming a placement resource for Shyina. It was represented to the court at a hearing on January 6, 1998 that this "record" had still not been presented to her or her attorney and the court ordered DCF to provide her with same immediately.[2] No reasonable explanation was given to Lisa Walker or the court as to why this document was not provided to Lisa Walker from shortly after Shyina's birth (6/2/97) to the date of the January 6, 1998 hearing. Essentially, the "record" in question is a DCF report that alleges Lisa Walker, during a period of time in her teenage years was "at risk" according to the definition of that phrase existing at the time of the report. It should be noted that no party put the "record" into evidence and that document was therefore not before the court. The representation of Social Worker, Jean Norvig, as made through the Assistant Attorney General, was that there was substantiated neglect and "the Department would not consider somebody who had substantiated neglect an appropriate person to license as foster care or pre-adoptive home." The problem for DCF, however, is that the "record" does not substantiate neglect. There was no apparent history of any assistance or intervention on behalf of Lisa Walker or her child as a result of that report. In fact, according to the testimony of Ms. Norvig, the "record" found Lisa Walker to be "at risk" and there was specifically no substantiated neglect determined or found.
Under cross examination by respondent mother's attorney, social worker Jean Norvig responded to the question "if there is a potential family member that wanted to be considered a custodian for a child and that family member had a history with DCF regardless of how far back it goes, and regardless of how substantial or insubstantial that might be, that this family member could never be considered by DCF as a custodian of a CT Page 7794 child." Response "Yes."
Ms. Norvig further testified that the category "at risk" is no longer used by DCF, whereas at one time it was a separate and distinct category from those of abuse and neglect. In attempting to define "at risk", Ms. Norvig answered in the affirmative to the following question posed by the attorney for respondent mother:
 "Q. "Would it be correct to say that the "at risk" category was more an acknowledgment by the Department that there was potential there for abuse to occur as opposed to actually having abuse occur; having had abuse actually occur?
 This would be a finding that there was a potential for that to happen as opposed to having found that it actually had happened?"
The report apparently did not provide much factual basis and provided counsel at trial with the opportunity to question Ms. Norvig on a variety of hypothetical scenarios. In response to the lack of factual basis the following question was posed to Ms. Norvig:
 "Q. So, you inferred facts not in the report and then drew your conclusion, is that correct?
"A. That's correct."
It is clear to the Court that DCF denied the Walkers the opportunity to be considered a placement resource for Shyina based upon this "record" of Lisa Walker even though same was vague and indefinite, was based on facts that were not clear or substantiated, and resulted in a conclusion ("at risk") that is no longer used by DCF. That denial, together with DCF's failure to produce this "record" for approximately seven months after it was used as a reason for denying the Walkers the right to be considered as a placement resource, was fundamentally unfair. This court, of course, cannot find that DCF would have considered the Walkers to be the most appropriate placement for Shyina during the pendency of this action. What this court can, and does, find is that DCF's failure to even consider the Walkers based on the facts presented effectively deprived Shyina of an option that may have been in her best interest. The fundamental CT Page 7795 unfairness, therefore, affects not only the Walkers, but extends as well to Shyina.
At the inception of DCF's involvement with this family an effort could have been made to preliminarily investigate the Walker family as a placement resource. If that investigation revealed nothing objectionable, Shyina could have been placed with her biological relatives pursuant to Connecticut General Statutes Section 17a-114(b). The forty-five day period of time allowed by that statute would have allowed DCF to fully investigate the Walkers to make a fair determination of whether DCF should support them in their efforts to be a permanent placement resource. DCF, however allegedly as a result of the "record", chose to ignore the close biological relatives of this newborn child as a resource and placed her in a foster family.
The natural consequence of DCF's position was that if the Walkers wished to continue their expressed interests in Shyina, they had to hire an attorney and proceed through a lengthy contested court proceeding. As stated, the Walkers have never waivered in their efforts. Although not people of great financial means, they hired a private attorney and did whatever was expected of them to have their voices heard.
Even more costly to them than the financial, however, was the length of time they would not be caretakers for Shyina. The fact is that Shyina has become quite bonded to the foster family as evidenced by uncontroverted evidence, as a result of Shyina having lived just about all of her two years of life with them. That bonding has provided the basis of much of the testimony in favor of commitment and continued placement with the foster family and specific reference is made to the testimony of the psychologists in that regard.
The testimony of the psychologists and their reports entered as evidence, although in agreement on their ultimate recommendations, differed markedly in many important respects. Dr. Mantell's report dated October 6, 1998 reflected findings made in the interactional evaluations of the foster parents with Shyina and of the Walkers with Shyina. The interactional with the foster parents presented an ideal reflection of a perfect relationship, as the doctor saw it, between them. The evaluation with the Walkers and Shyina presented the most negative images one could imagine in an adult/child relationship. The following are statements made by Dr. Mantell in his report (State's Exhibit CT Page 7796 6):
 "I noted that the uncle seemed uncomfortable. He had still not made eye contact with me and offered no information in response to my questions.
 "The Walkers were all attentive, playful, and appropriate, trying to entice and activate Shyina. Shyina then looked at me. There was a blank expression on her face. The Walkers were pleasant and appropriate, soft and child focused, but the child was not responding to them emotionally.
 "The Walkers used all the available toys to engage Shyina-puppet, plastic Winnie the Pooh bear, rattle, elves, phones, and truck, all to no avail.
 "Denise stretched her arms to Shyina who on command reached out to her also though the child had been primarily interacting with the aunt. She was still expressionless ten minutes into the session. Then Denise and Mrs. Walker stood her up. The child stood motionless, Denise called for her to walk but the child did not move. She looked at her uncle and aunt with big eyes. All three Walkers modeled smiles for Shyina but the child did not imitate them. She looked at me and at 20 minutes into the session was still expressionless.
 "The aunt, uncle and Denise appeared mutually comfortable. They seem to interact easily with one another and with strong familiarity. My sense was that Shyina did not belong psychologically to this group.
 "The session went for an hour. During that time, I did not see any emotional responsiveness on Shyina's part to her aunt, uncle, and cousin. She sat amongst them where she was placed and allowed herself to be animated physically as they wished. Occasionally the child would look at me with a blank expression.
 "I observed no hugging or cuddling of the child nor any nestling by the child of Walker family members. Occasionally Denise would give the child a kiss to which the child did not respond. At no point did I observe the child reach out for physical contact or make any CT Page 7797 approach movements toward the Walkers on her own. She made no sounds. The aunt offered juice from a bag that the foster parents had brought and there was no response from the child.
 "Denise tried repeatedly to animate Shyina. The child would go with Denise showing no pleasure nor any resistance. The child was like a rag doll.
"Shyina was still passive and expressionless.
 "Denise asked Shyina for a kiss and reached over to kiss her. Shyina withdrew. Denise asked Shyina for a kiss and as Denise put her face near Shyina' s, Shyina forcefully pushed Denise's face away. That was the first piece of intentional behavior I had seen from the child that day.
 "During this entire time, I saw no pleasure in the child. The child was then passed to the foster mother. The aunt and cousin said goodbye to the child. The child made no return signs to the aunt and Denise and looked at me expressionless.
 "I observed no connection between the child and members of the Walker family."
 The observations were not only incredible but differed markedly from the observations of Dr. Sharon Zouch Malin, Ph.D. which take place on October 26. 1998 (Defendant's Exhibit 3):
 "Shyina's date of birth is June 2, 1997 and she was almost 17 months old at the time of the observation. Lisa and Andre indicated that she had just started walking. She smiled periodically and went to each one of them when they put their arms out to her and called her name. Shyina would sit on their lap or on the floor near them, depending upon what toy(s) they were playing with. She engaged in the games of "peek-a-boo", "patty cake" and rolling balls back and forth. There was a battery-operated singing flower that sang when touched and Shyina would dance when the music played Shyina would also occasionally take toys to Ms. Romaine, who accepted them. She did not seem to feel shy or strange around Lisa and Andre. CT Page 7798
 "A very noticeable point was Shyina's lack of speech. She smiled and her face would be animated, but she did not speak one word in the hour that she was observed. Usually a child has about 19 words in their vocabulary by 18 months. There may be some delayed development, especially if she did not walk until recently.
Concluding her report, she wrote:
 "Summary: Overall, Shyina appears to be comfortable with her maternal aunt and uncle, Lisa and Andre Walker. They engaged in age appropriate play and displayed warmth and affection in holding and her talking to her."
As a result of the highly incredible findings of Dr. Mantell and the conflicting findings of Dr. Malin, together with DCF's contention throughout this case that to remove Shyina from the care of the foster family to which she had bonded would not be in her best interests and in fact would cause harm to her, the court met in chambers with all counsel where it was agreed to have a court appointed psychologist conduct an interactive evaluation after setting up a more extensive period of visitation to determine the affect of same on Shyina. Rodolfo Jose Rosado, Ph.D. was appointed by the court with all parties in agreement. Dr. Rosado's findings were set forth in his Family Evaluation filed with the court on January 19, 1999 (Court's Exhibit #1). Among his findings:
 "In past Psychological Evaluations, it was noted that neither Mr. or Ms. Walker displayed psychiatric symptoms (no evidence of a thought disorder or affective disorder, and no characteristics associated with a DSM-IV diagnosis and despite their apparent immaturity, there were no identified factors that would conceivable interfere with their parenting abilities.
 "There are no reports that indicate that either Mr. or Ms. Walker have displayed behaviors that would suggest any risk to either Denise Romaine or Shyina
 "When describing parenting, Mr. Walker describes himself as an affectionate person who wishes the best for his children (Ms. Walker's daughter and Shyina). CT Page 7799
 "Ms. Walker is also an affectionate, child centered person.
 "Mr. and Ms. Walker speak highly about Shyina's foster parents. They acknowledge that Shyina has flourished in their care, and have no doubt that they love her. If given custody they would like Shyina to remain in contact with Mr. and Ms. Fields, perhaps serving as Shyina's Godparents.
 "Shyina spontaneously sought physical contact and attention from all three adults. She seemed especially close to Ms. Walker's mother, and several times approached her to sit on her lap and play with various toys. Shyina smiled spontaneously, and never displayed any anxiety, fear, or withdrawn behavior. Although characteristically nonverbal, she was sufficiently engaging and energetic, appropriately playing with the toys.
 "Mr. Walker was a usually quiet person when observed with adults, but it was noted that he was more comfortable and expressive with the children. He and Shyina played well with each other, and both clearly enjoyed the physical closeness. Shyina also related well with Ms. Walker and Denise. They were affectionate, attentive and consistently caring. Ms. Walker was especially affectionate, freely and spontaneously hugging and kissing all of the children. All of the children responded well to all of the adults (and Denise), and it was clear that they were happy together."
 In response to one of the agreed upon questions presented to Dr. Rosado, namely:
 "Is there evidence that disruption of Shyina's relationship with the foster parents will have long term effects, such as an attachment disorder."
Dr. Rosado answered:
 "Shyina did not display any behavioral difficulties or behavioral problems when observed with the Walker family, even after spending three days and two nights of CT Page 7800 visitation. When observed at the end of the visit, Shyina remained an engaging, sociable, and well related child, and the extent of her positive behavior did not suggest the potential to develop psychological problems."
 In testimony during the trial, Dr. Rosado testified to the following effect:
 "Shyina related well with both sets of adults. The adults who were involved in her life, which included Mr. and Mrs. Walker, Mrs. Walker's mother and the Fields, Mr. and Mrs. Fields as well their own biological children, that they are all related in a generally warm and affectionate manner. They were all supportive. Shyina is very lucky to have people that love her so much.
 "Q. Did you notice any specific differences in Shyina B., relation to either the Walkers or the Fields in her interactions with them?
 "A. There were a combinations of similarities and differences. The similarities were that she was comfortable, she related well. We look for signs of anxiety, apprehension, fear, social withdrawals as indications of potential problems and those were not there in either case. She was comfortable in both homes when observed in both home settings."
He further testified that:
 "In comparison of the two families, it was noted that both have strengths to share with Shyina, and in neither case are there characteristics that indicate potential difficulties or risk to the child. In this comparison, it was observed that Shyina displayed a more significant attachment and stronger positive emotional reaction when observed with Mr. and Mrs. Fields. That was the one significant difference that I observed in the two homes. There were other differences which — that were notable, but not significant."
The factor which weighs most heavily in favor of the disposition of commitment with placement in the foster family is the bond which apparently exists between Shyina and the foster family. The CT Page 7801 factor which weighs most heavily in favor of the disposition of a transfer of custody and guardianship to the Walkers is their close and strong biological tie to Shyina, her family and her mother. The court is satisfied and does find, that both homes are fit, comfortable and safe settings for Shyina. The court is mindful that a sudden disruption in the bond between Shyina and the foster family could be upsetting to her. The court however believes on the basis of Dr. Rosado's testimony that a transition could be accomplished in a manner sensitive to Shyina's needs. In response to the following question to Dr. Rosado by the child's attorney:
 "Q. If Shyina were to be moved from this family and either placed with the Walkers or with another family at this point, in your professional opinion would that effect her ability to bond and attach either now or later on in life?
 "A. That would depend primarily on how the change was implemented and having more to do with the adults involved than with Shyina. In that Shyina displayed an ability to develop close affectionate attachment with other people it represents a skill that I believe she posses, that skill belongs to her."
The court is also mindful that, if at all possible, Shyina is entitled to be raised with her family, including her biological relatives. Dr. Rosado testified extensively on the subject of the role of the extended family in raising the children of biological parents who could not care for them, especially in certain African American and Latino families.
 Citing this as a growing phenomenon. Dr. Rosado testified:
 ". . . from a — from a cultural aspect with African-American and AfricanCaribbean families have long used extended family supports where children are surrounded by a variety of relatives who love them and take care of them and they can develop attachments and enduring attachments with each individuals and the attachments would be sustained despite geographical difference or differences of the time. And that because people say, we love you, you're one of us and we belong together. And even so a child may not have physical CT Page 7802 contact with the adults all the time there is a feeling of mutual support in a sense of belonging is an affiliation."
In fact, the Walker family presents a good example of this phenomenon as they have, during the pendency of this action, actually taken into their home the two children of Lisa Walker's sister, by Juvenile Court Order, and have moved to Waterbury to secure a larger apartment to accommodate these children and the hopeful addition of Shyina. When discussing "best interest" we must remain mindful the short term best interest may not necessarily be in the long term best interest of a child. In the instant case, despite all possible efforts, some disruption will likely occur to Shyina if she is transitioned to the Walkers. Acknowledging that an argument exists that any disruption in a child's life is not in that child's best interest, the court is satisfied that any disruption as a result of a transition, if handled appropriately, would not result in long term problems for Shyina. The reality is that children are removed from their parents every day by DCF and are not reunited with them often for periods of time longer than the two years Shyina has been in foster care. Bonding with foster families is not only inevitable, but most often desirable. It is that bond which seems to provide the basis for Dr. Rosado's ultimate opinion, and that is understandable in light of the limited role he played in these proceedings. The equities involved in these proceedings, however, necessitate this court to keep this argument in perspective.
On the other hand, depriving Shyina of her biological relatives, when it has not been shown that placement with them would be detrimental to her, would certainly not be in her long term best interests.
III. Applicable Law
In the context of an appeal filed by a parent as a result of a probate decree affecting that parent's status in relation to his adult mentally retarded daughter, the Connecticut Appellate Court pointed out that: "Our conclusion that the interest of a parent in the welfare of his child is significantly different from the interest of any other family member is supported by the fact that only the relationship between parent and child is constitutionally protected." Buchholz's Appeal from Probate,9 Conn. App. 413, 419 (1987), citing McGaffin v. Roberts, (143 Conn. 343) 400 supra; Quilloin v. Walcott, 434 U.S. 246, 255, 98 CT Page 7803 S.Ct. 549, 54 L.Ed.2d 511, reh. denied, 435 U.S. 918,98 S.Ct. 1477, 55 L.Ed.2d 511 (1978)
Despite the fact that biological relatives, other than parents, do not enjoy constitutionally protected rights to children, there is no question that they are (and should be) considered a primary placement resource for children when the biological parents are unable to adequately provide for them. Statutory law, as well as practice and procedure, are clear in this regard. Most often grandparents and other relatives, not found objectionable by DCF, are actually welcomed placement resources by DCF, judges of the Juvenile Court and other interested parties. Especially in light of the testimony in the instant case from Dr. Rosado that it is an increasing phenomenon in this country where relatives care for children when their parents cannot do so, and that this extended family support is especially a part of the family lives of African-American and Latino families, the importance of biological relatives as placement resource is significant.
The Connecticut Supreme Court articulated in the case of Cappettav. Cappetta, 196 Conn. 10 (1985) that:
 "(t)he award of custody requires the trial court to make difficult and sensitive inquiries into the relationships between the adults and children. In the search for an appropriate custodial placement, the primary focus of the court is the best interests of the child, the child's interest in sustained growth, development, well-being, and in the continuity and stability of its environment." Id. At 16.
Each case is, by its very nature, unique and distinct. The circumstances of each case and the credibility of the witnesses necessarily create discretionary findings and decisions by the Court.
 "While the best interests of the child standard does not have a precise meaning, it does not lack metes and bounds. Our case law has defined and circumscribed that standard over the years . . . Standards of mathematical precision are neither possible nor desirable in this field: much must be left to the trial judge's experience and judgment." State v. Anonymous, 179 Conn., 155, 165, 425 A.2d 939 (1979).
CT Page 7804
And while the court has the obligation to hear and assess the weight of expert testimony and evidence, a trial judge is free to judge the credibility of expert witnesses. In re: Kezia M.,33 Conn. App. 12. 33 Conn. App. 12, 22, cert. denied, 228 Conn. 915
(1993).
The Standard of Proof is by a fair preponderance of the evidence, In re: Joshua Z., 26 Coim. App. 58, 63, cert. denied,221 Conn. 901 (1991).
IV. Disposition
Based upon the foregoing, the Court finds that the following Orders are in Shyina's best interest, as proven by a fair preponderance of the evidence:
 1. Custody and guardianship of Shyina is hereby granted to her maternal uncle and aunt, Andre and Lisa Walker, subject to the period and schedule of transition as set forth below.
 2. Transition to the Walker home shall be in accordance with a schedule of increased visitation to be prepared by Dr. Rosado.
 3. Ongoing visitation between Shyina and the foster family shall be pursuant to a schedule of visitation as may be recommended by Dr. Rosado, provided the Walkers and foster family are in agreement. This order presuppose parties were in earnest when they offered, through testimony and representations of their counsel, to both remain a continuing part of Shyina's life subsequent to the dispositional decision in this case.
 4. An In Court Review is to be scheduled three months from this date at which time the court is to be presented with a report from Dr. Rosado regarding the status of Shyina. Said report shall document the transition and also report the status of Shyina's emotional and psychological adjustment to the Walker home.
 5. DCF is ordered to keep an active file on Shyina for a period of six months. DCF is to monitor the transition and placement in the Walker home and is to immediately notify CT Page 7805 the court if it is concerned with any element of the transition or placement.
 6. The Walkers are ordered to cooperate with Dr. Rosado and DCF with regard to these orders.
 7. DCF is ordered to assist the parties during the period of transition by providing transportation for Shyina and in providing any therapeutic support to Shyina that is recommended by Dr. Rosado.
Hon. Robert T. Resha